FILED
CHARLOTTE, NC
MAR 3 2015
U.S. DISTRICT COURT
WESTERN DISTRICT OF NC

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DAVID HOWELL PETRAEUS )<br>_____ ) | DOCKET NO. 3:15 CR 47<br><br>**FACTUAL BASIS** |

NOW COMES the United States of America, by and through Anne M. Tompkins, United States Attorney for the Western District of North Carolina, James P. Melendres, Trial Attorney, Jill Westmoreland Rose, Assistant United States Attorney, and Richard S. Scott, Trial Attorney, and hereby files this Factual Basis in support of the Plea Agreement filed simultaneously in this matter.

This Factual Basis does not attempt to set forth all of the facts known to the United States at this time. By their signatures below, the parties expressly agree that there is a factual basis for the guilty plea that the defendant will tender pursuant to the Plea Agreement. The parties also agree that this Factual Basis may, but need not, be used by the United States Probation Office and the Court in determining the applicable advisory guideline range under the United States Sentencing Guidelines or the appropriate sentence under 18 U.S.C. § 3553(a). The defendant agrees not to object to any fact set forth below being used by the Court or the United States Probation Office to determine the applicable advisory guideline range or the appropriate sentence under 18 U.S.C. § 3553(a). The parties' agreement does not preclude either party from hereafter presenting the Court with additional facts which do not contradict facts to which the parties have agreed not to object and which are relevant to the Court's guideline computations, to 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties stipulate that the allegations in the Bill of Information and the following facts are true and correct, and that had the matter gone to trial, the United States would have proven them beyond a reasonable doubt with admissible and credible evidence. Specifically, the evidence would establish, at a minimum, the following facts:

At all relevant times,

### The Defendant

1. Defendant DAVID HOWELL PETRAEUS, a citizen of the United States and resident of Arlington, Virginia, was a United States Army four-star general when he retired from the Army on or about August 31, 2011. From on or about July 4, 2010, to on or about July 18, 2011, defendant DAVID HOWELL PETRAEUS served as Commander of the International Security Assistance Force ("ISAF") in Afghanistan. From on or about September 6, 2011, to on or about November 9, 2012, defendant DAVID HOWELL PETRAEUS served as Director of the Central Intelligence Agency ("CIA").

### Classified Information

2. Those persons with security clearances granting them access to classified information were required to properly store and secure classified information, by Title 18, United States Code, Sections 793 and 1924, and applicable rules, regulations, and orders.

3. Classified information was defined by Executive Order 13526 ("E.O. 13526") and relevant preceding Executive Orders, as information in any form that: (1) is owned by, produced by or for, or under the control of the United States government; (2) falls within one or more of the categories set forth in E.O. 13526; and (3) is classified by an original classification authority

2

who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security. Where such unauthorized disclosure reasonably could be expected to cause "damage" to the national security, the information is classified as "Confidential." Where such unauthorized disclosure reasonably could be expected to cause "serious damage" to the national security, the information is classified as "Secret." Where such unauthorized disclosure reasonably could be expected to cause "exceptionally grave damage" to the national security, the information is classified as "Top Secret."

4. E.O. 13526 also provides that certain senior U.S. officials are authorized to establish "special access programs" upon a finding that "the vulnerability of, or threat to, specific information is exceptional" and "the normal criteria for determining eligibility for access applicable to information classified at the same level are not deemed sufficient to protect the information from unauthorized disclosure." Within the U.S. Intelligence Community, the Director of National Intelligence is authorized to establish special access programs for intelligence sources, methods, and activities. Such intelligence programs are called "Sensitive Compartmented Information Programs" or SCI Programs. A term commonly used to describe certain materials in such programs is "code word."

5. Pursuant to E.O. 13526, a person may gain access to classified information only if a favorable determination of eligibility for access has been made by an agency head or an agency head's designee, the person has signed an approved nondisclosure agreement, and the person has a "need-to-know" the information.

6. "Need-to-know" means a determination by an authorized holder of classified information that a prospective recipient requires access to specific classified information in order to perform or assist in a lawful and authorized government function.

7. The classified information being accessed may not be removed from the controlling agency's premises without permission. Moreover, even when SCI is maintained on the controlling agency's premises, it must be stored in a Sensitive Compartmented Information Facility ("SCIF"), which is an accredited area, room, group of rooms, building, or installation designed to prevent as well as detect visual, acoustical, technical, and physical access by unauthorized persons.

### The Department of Defense

8. The Department of Defense ("DOD") was a United States government military agency. The DOD's headquarters were at Arlington, Virginia. The DOD was responsible for providing the military forces needed to deter war and protect the security of the United States. Moreover, through its subordinate national intelligence services, including the Defense Intelligence Agency, the National Security Agency, the National Geospatial-Intelligence Agency, and the National Reconnaissance Office, the DOD was responsible for, among other things, collecting information that revealed the military plans, intentions, and capabilities of the United States' adversaries and the bases for their decisions and actions, as well as conducting clandestine actions, at the direction of the President and his authorized designee, designed to preempt threats and achieve the United States' policy objectives.

9. The responsibilities of certain DOD employees required that their association with the DOD be kept secret; as a result, the fact that these individuals were employed by the DOD

4

was classified. The responsibilities of other DOD employees required that, while their employment by the DOD was itself not secret, their association with certain DOD programs and their particular activities on behalf of the DOD were kept secret; accordingly, such information was classified. Disclosure of the fact that such individuals were employed by the DOD, associated with certain DOD programs, or engaged in particular activities on behalf of the DOD, had the potential to damage national security in ways that ranged from preventing the future use of individuals in a covert or clandestine capacity, to compromising clandestine actions and intelligence-gathering methods and operations, to endangering the safety of DOD employees and those who interacted with them.

## The Central Intelligence Agency

10. The CIA was a United States government intelligence agency. The CIA's headquarters were at Langley, Virginia. The CIA was responsible for, among other things, collecting information that revealed the plans, intentions, and capabilities of the United States' adversaries and the bases for their decisions and actions, as well as conducting clandestine actions, at the direction of the President and his authorized designees, designed to preempt threats and achieve the United States' policy objectives.

11. The responsibilities of certain CIA employees required that their association with the CIA be kept secret; as a result, the fact that these individuals were employed by the CIA was classified. The responsibilities of other CIA employees required that, while their employment by the CIA was itself not necessarily secret, their association with certain CIA programs and their particular activities on behalf of the CIA be kept secret; accordingly, such information was classified. Disclosure of the fact that such individuals were employed by the CIA, associated

with certain CIA programs, or engaged in particular activities on behalf of the CIA, had the potential to damage national security in ways that ranged from preventing the future use of individuals in a covert or clandestine capacity, to compromising clandestine actions and intelligence-gathering methods and operations, to endangering the safety of CIA employees and those who dealt with them.

## Criminal Conduct

12. Throughout his employment by the DOD, defendant DAVID HOWELL PETRAEUS entered into various agreements with the United States regarding the protection and proper handling of classified information. Examples of these agreements include:

a. On March 15, 2006, as a condition of being granted access to certain SCI, DAVID HOWELL PETRAEUS entered into a Non-Disclosure Agreement ("NDA") with the DOD in which he agreed, in pertinent part, as follows:

> I have been advised that unauthorized disclosure, unauthorized retention, or negligent handling of SCI by me could cause irreparable injury to the United States or be used to advantage by a foreign nation. I hereby agree that I will never divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government department or agency . . . that last authorized my access to SCI.
>
> I hereby agree to submit for security review by the [agency] that last authorized my access to such information or material, any writing or other preparation in any form . . . that contains or purports to contain any SCI . . . that I contemplate disclosing to any person not authorized to have access to SCI . . .
>
> In addition, I have been advised that any unauthorized disclosure of SCI by me may constitute a violation or violations of United States criminal laws, including the provisions of . . . Section[ ] 793 . . . [of] Title 18, United States Code . . .
>
> I agree that I shall return all materials that may have come into my possession or for which I am responsible because of such access, upon demand by an authorized representative of the United States Government or upon the conclusion of my employment or other relationship with the United States Government entity

6

> providing me access to such materials. If I do not return such materials upon request, I understand this may be a violation of Section 793, Title 18, United States Code . . .

Defendant DAVID HOWELL PETRAEUS entered into at least 13 additional NDAs in the course of his DOD employment. In each instance, DAVID HOWELL PETRAEUS promised never to disclose SCI to anyone not authorized to receive it without prior written authorization from the United States government, and he acknowledged that unauthorized retention and/or disclosure of classified information could cause irreparable injury to the United States and be used to advantage by a foreign nation. The scope of these NDAs encompassed classified information referenced in this Statement of Facts.

      b.    As a condition of being granted access to classified information, defendant DAVID HOWELL PETRAEUS entered into a Secrecy Agreement with the DOD, in which he agreed, in pertinent part, as follows:

> I accept the responsibilities associated with being granted access to classified national security information. I am aware of my obligation to protect classified national security information through proper safeguarding and limiting access to individuals with the proper security clearance and official need to know. I further understand that, in being granted access to classified information, a special confidence and trust has been placed in me by the United States Government.

Defendant DAVID HOWELL PETRAEUS entered into at least 13 additional Secrecy Agreements in the course of his DOD employment. In each instance, defendant DAVID HOWELL PETRAEUS agreed to protect classified national security information through proper safeguarding and limiting access to individuals with proper security clearance and official need-to-know.

      13.    On or about August 31, 2011, defendant DAVID HOWELL PETRAEUS retired from the DOD, after which time he retained his continuing lifelong obligation to the United

7

Case 3:15-cr-00047-RJC-DCK   Document 3   Filed 03/03/15   Page 7 of 15

States to protect the classified information to which he had been granted access while employed by the DOD.

14. As a condition of his employment by the CIA, defendant DAVID HOWELL PETRAEUS entered into various agreements with the United States, including, for example, the following:

    a. On June 16, 2011, as a condition of being granted access to certain SCI, defendant DAVID HOWELL PETRAEUS entered into a NDA with the CIA which was materially identical to the March 2006 NDA he signed while employed by the DOD.

    b. On November 26, 2012, following his resignation from the CIA, defendant DAVID HOWELL PETRAEUS entered into a Secrecy Agreement with the CIA in which he agreed, in pertinent part, as follows:

> I understand that in the course of my employment . . . I may be given access to information or material that is classified or is in the process of a classification determination . . . that, if disclosed in an unauthorized manner would jeopardize intelligence activities of the United States Government. I accept that by being granted access to such information or material I will be placed in a position of special confidence and trust and become obligated to protect the information and/or material from unauthorized disclosure.
>
> As a further condition of the special confidence and trust reposed in me by the Central Intelligence Agency, I hereby agree to submit for review by the Central Intelligence Agency any writing or other preparation in any form . . . which contains any mention of intelligence data or activities, or contains any other information or material that might be based on [classified information] . . .
>
> I understand that . . . the disclosure of information that I agreed herein not to disclose can, in some circumstances, constitute a criminal offense . . .

15. On or about November 9, 2012, defendant DAVID HOWELL PETRAEUS resigned from the CIA, after which time he retained his continuing lifelong obligation to the

8

United States to protect the classified information to which he had been granted access while employed by the CIA.

16. During his tenure at the DOD and the CIA, defendant DAVID HOWELL PETRAEUS held a United States government security clearance allowing him access to classified United States government information. As a result, defendant DAVID HOWELL PETRAEUS had regular access to classified and national defense information relating to DOD and CIA programs, operations, methods, sources, and personnel.

17. During his tenure as Commander of ISAF in Afghanistan, defendant DAVID HOWELL PETRAEUS maintained bound, five-by-eight-inch notebooks that contained his daily schedule and classified and unclassified notes he took during official meetings, conferences, and briefings. The notebooks had black covers and, for identification purposes, defendant DAVID HOWELL PETRAEUS taped his business card on the front exterior of each notebook. A total of eight such books (hereinafter the "Black Books") encompassed the period of defendant DAVID HOWELL PETRAEUS's ISAF Command and collectively contained classified information regarding the identities of covert officers, war strategy, intelligence capabilities and mechanisms, diplomatic discussions, quotes and deliberative discussions from high-level National Security Council meetings, and defendant DAVID HOWELL PETRAEUS's discussions with the President of the United States of America.

18. The Black Books contained national defense information, including Top Secret//SCI and code word information.

19. The National Defense University ("NDU") was an institution of higher education funded by the DOD, intended to facilitate high-level training and education, as well as the

9

development of national security strategy. It was located on the grounds of Fort Lesley McNair, in Washington, D.C. NDU was a repository for the DOD's classified collections.

20. From in or about July 2009 to in or about July 2012, defendant DAVID HOWELL PETRAEUS's DOD historian gathered and organized the classified materials that defendant DAVID HOWELL PETRAEUS collected during his DOD tenure. Defendant DAVID HOWELL PETRAEUS never provided the Black Books to his DOD historian. Instead, defendant DAVID HOWELL PETRAEUS personally retained the Black Books.

21. In or about September 2012, defendant DAVID HOWELL PETRAEUS's DOD historian transferred defendant DAVID HOWELL PETRAEUS's classified collection to NDU for storage and archiving. Because defendant DAVID HOWELL PETRAEUS personally retained the Black Books, they were never transferred to NDU.

22. On or about August 4, 2011, after defendant DAVID HOWELL PETRAEUS returned permanently to the United States from Afghanistan, during a conversation, recorded by his biographer, defendant DAVID HOWELL PETRAEUS stated that the Black Books were "highly classified" and contained "code word" information:

| Biographer: | By the way, where are your black books? We never went through... |
| --- | --- |
| PETRAEUS: | They're in a rucksack up there somewhere. |
| Biographer: | Okay ... You avoiding that? You gonna look through 'em first? |
| PETRAEUS: | Umm, well, they're really – I mean they are highly classified, some of them. They don't have it on it, but I mean there's code word stuff in there. |

10

23. On or about August 27, 2011, defendant DAVID HOWELL PETRAEUS sent an e-mail to his biographer in which he agreed to provide the Black Books to his biographer.

24. On or about August 28, 2011, defendant DAVID HOWELL PETRAEUS delivered the Black Books to a private residence in Washington, D.C. (the "DC Private Residence"), where his biographer was staying during a week-long trip to Washington, D.C. The DC Private Residence was not approved for the storage of classified information.

25. Thereafter, from on or about August 28, 2011, to on or about September 1, 2011, defendant DAVID HOWELL PETRAEUS left the Black Books at the DC Private Residence in order to facilitate his biographer's access to the Black Books and the information contained therein to be used as source material for his biography, titled *All In: The Education of General David Petraeus*, released by Penguin Press in 2012. No classified information from the Black Books appeared in the aforementioned biography.

26. On or about September 1, 2011, defendant DAVID HOWELL PETRAEUS retrieved the Black Books from the DC Private Residence and returned them to his own Arlington, Virginia home (the "PETRAEUS Residence").

27. On or about November 9, 2012, defendant DAVID HOWELL PETRAEUS resigned from the CIA. Approximately two weeks after his November 9, 2012 resignation, defendant DAVID HOWELL PETRAEUS was debriefed and read-out of the SCI compartments and Special Access Programs to which he previously had been granted access. Specifically, on or about November 26, 2012, defendant DAVID HOWELL PETRAEUS executed two SCI NDAs which contained debriefing acknowledgments, a Secrecy Agreement, and a Security Exit Form. The Security Exit Form included seven provisions regarding his continuing duty to

11

protect classified information from disclosure. Among other things, by signing the Security Exit Form, defendant DAVID HOWELL PETRAEUS adopted the following provision: "I give my assurance that there is no classified material in my possession, custody, or control at this time." At the time he provided this assurance, the Black Books were still in the PETRAEUS Residence.

28. On or about January 3, 2013, a SCIF, which had been installed at the PETRAEUS Residence by the CIA during defendant DAVID HOWELL PETRAEUS's tenure as CIA Director, was closed and de-accredited. The SCIF was subsequently removed on or about February 13, 2013.

29. On or about April 5, 2013, the FBI executed a court-authorized search warrant at the PETRAEUS Residence and seized the Black Books from an unlocked desk drawer in the first-floor study of the PETRAEUS Residence.

30. Between in or about August 2011, and on or about April 5, 2013, defendant DAVID HOWELL PETRAEUS, being an employee of the United States, and by virtue of his employment, became possessed of documents and materials containing classified information of the United States, and did unlawfully and knowingly remove such documents and materials without authority and thereafter intentionally retained such documents and materials at the DC Private Residence and the PETRAEUS Residence, aware that these locations were unauthorized for the storage and retention of such classified documents and materials.

31. On or about June 12, 2012, in two separate interviews conducted by special agents of the Federal Bureau of Investigation ("FBI") regarding investigations unrelated to the instant offense, defendant DAVID HOWELL PETRAEUS acknowledged that he understood that making false statements to the FBI in the course of a criminal investigation was a crime.

Specifically, on June 12, 2012, defendant DAVID HOWELL PETRAEUS was interviewed in his office at CIA Headquarters in Langley, Virginia, in connection with two media leak investigations. During both interviews, defendant DAVID HOWELL PETRAEUS affirmed in writing, "I understand that providing false statements to the Federal Bureau of Investigation is a violation of law."

32. On or about October 26, 2012, defendant DAVID HOWELL PETRAEUS was interviewed by two FBI special agents in his office at CIA Headquarters in Langley, Virginia. Defendant DAVID HOWELL PETRAEUS was advised that the special agents were conducting a criminal investigation. During that interview, the special agents questioned DAVID HOWELL PETRAEUS about the mishandling of classified information. In response to those questions, defendant DAVID HOWELL PETRAEUS stated that (a) he had never provided any classified information to his biographer, and (b) he had never facilitated the provision of classified information to his biographer. These statements were false. Defendant DAVID HOWELL PETRAEUS then and there knew that he previously shared the Black Books with his biographer.

33. The acts taken by defendant DAVID HOWELL PETRAEUS were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

34. This Statement of Facts includes those facts necessary to support the Plea Agreement between the defendant and the government. It does not include each and every fact known to the defendant or to the government, and it is not intended to be a full enumeration of all the facts surrounding defendant DAVID HOWELL PETRAEUS's case.

//

//

## United States Sentencing Guidelines

35. Further, in accordance with Fed. R. Crim. P. 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States and the defendant will recommend to the Court that the following provisions of the United States Sentencing Guidelines apply:

| | | |
|---|---|---|
| Base Offense Level: | 6 | [U.S.S.G. § 2X5.2] |
| Abuse of Position of Trust: | +2 | [U.S.S.G. § 3B1.3] |
| Obstruction of Justice | +2 | [U.S.S.G. § 3C1.1] |
| Acceptance of Responsibility | −2 | [U.S.S.G. § 3E1.1(a)] |
| **Total Adjusted Offense Level** | **8** | |

ANNE M. TOMPKINS
UNITED STATES ATTORNEY

*/s/* 2/23/2015

JAMES P. MELENDRES
TRIAL ATTORNEY

*/s/* Feb. 23, 2015

JILL WESTMORELAND ROSE
ASSISTANT UNITED STATES ATTORNEY

*/s/* 2/23/2015

RICHARD S. SCOTT
TRIAL ATTORNEY

//

//

//

//

//

14

Defendant's Signature: After consulting with my attorney, and pursuant to the Plea Agreement entered into this day between myself and the United States, I hereby stipulate that the above Factual Basis is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 22 February 2015

_____
David Howell Petraeus
Defendant


Defense Counsel Signature: I am counsel for the defendant in this case. I carefully reviewed the above Factual Basis with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: Feb 23, 2015

_____
David E. Kendall
Williams & Connolly LLP
Counsel for the Defendant


Defense Counsel Signature: I am counsel for the defendant in this case. I carefully reviewed the above Factual Basis with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: Feb. 23, 2015

_____
Simon A. Latcovich
Williams & Connolly LLP
Counsel for the Defendant

15